386 So.2d 1209 (1980)
Jeff Lee PORTER, Appellant,
v.
The STATE of Florida, Appellee.
No. 77-2615.
District Court of Appeal of Florida, Third District.
July 1, 1980.
Rehearing Denied September 4, 1980.
*1210 Bennett H. Brummer, Public Defender and Elliot H. Scherker, and Karen M. Gottlieb, Asst. Public Defenders, for appellant.
Jim Smith, Atty. Gen., and Susan Minor, Asst. Atty. Gen., for appellee.
Before SCHWARTZ and DANIEL S. PEARSON, JJ., and PEARSON, TILLMAN (Ret.), Associate Judge.
DANIEL S. PEARSON, Judge.
This year is the triennial of Porter v. State,[1] and we reluctantly commemorate it by again reversing Porter's conviction for sale and possession of heroin.
We will not prolong the observance of this anniversary. Following our earlier reversal, Porter was retried for selling (and in the process, possessing) thirty dollars worth of heroin to an undercover police officer, Sandra Tavanis.
The State's case was based primarily on the testimony of Tavanis. Nobody was in the immediate presence of Tavanis (seated in her car in a bar parking lot) and Porter (standing next to Tavanis' car) during the several minutes of negotiations immediately preceding the sale and when the money and contraband were exchanged. Several police officers in another car about seventy yards away had Tavanis under surveillance. The transaction occurred in the early evening on November 14, 1975. Since Tavanis was to continue her undercover work in the same general locale, Porter's arrest was delayed until January 8, 1976.
Porter was the only witness for the defense. During his brief direct examination,[2] the following occurred:
"Q... . Did you ever sell heroin to Sandra Tavanis?
"MR. GINSBURG [the prosecutor]: Objection; leading.
"THE COURT: Sustained.
"Q. Did you ever make a sale of heroin ...
"MR. GINSBURG: Objection.

*1211 ...
"THE COURT: The objection is sustained as to the last question."
The abbreviated definition of a leading question as one which may be answered yes or no, see, e.g., 3 Wigmore, Evidence § 772 (Chadbourn rev. 1970), is misleading. The real meaning of this definition is that a question which suggests only the answer yes is leading; a question which suggests only the answer no is leading; but a question which may be answered either yes or no, and suggests neither answer as the correct one, is not leading.
"Among other definitions, a leading question has been defined as one which may be answered `yes' or `no.' This, however, is not the most usual definition, or the one most exactly fixing the meaning of the term. The proper signification of the expression is a suggestive question,  one which suggests or puts the desired answer into the mouth of the witness... We agree with the Supreme Court of Michigan, that a question is not necessarily objectionable as leading because it can be answered `yes' or `no,' and that a leading question is one that points out the desired answer, and not merely one that calls for a simple affirmative or negative." Coogler v. Rhodes, 38 Fla. 240, 244, 21 So. 109, 110 (1897).
See also United States v. Durham, 319 F.2d 590 (4th Cir.1963) ("The essential test of a leading question is whether it so suggests to the witness the specific tenor of the reply desired by counsel that such a reply is likely to be given irrespective of an actual memory."); Florida Motor Lines Corporation v. Barry, 158 Fla. 123, 27 So.2d 753 (1946).[3]
In a case closely on point,[4] the New Jersey Supreme Court determined that the direct examination question, "At any time did you intentionally strike anybody with this ax?," put to a defendant accused of atrocious assault and battery, was not leading. The court said:
"The objection that the question was `leading' was unsound. In a sense every question is `leading.' If interrogation did not lead, a trial would get nowhere. Indeed one vice of a question such as, `What is your position in this case?,' is that is does not lead enough, and thus would deny the opposing party an opportunity to guard against the rankest kind of improper proof. A question must invite the witness's attention to something. No formula can be stated with confidence that it will embrace all situations. But it may be said that ordinarily a question is not improperly leading unless it suggests what the answer should be or contains facts which in the circumstances can and should originate with the witness. See generally McCormick, Evidence § 6 (1954); 3 Wigmore, Evidence §§ 769-72 (3d ed. 1940). The question whether Abbott intentionally struck any of the Scaranos with the ax was perfectly proper; we do not see how else it could be *1212 phrased. Cf. State v. Len, 108 N.J.L. 439, 440, 158 A. 749 (Sup.Ct. 1932)." State v. Abbott, 36 N.J. 63, 174 A.2d 881, 889 (1961).
In the present case the State argues that even if the questions were not leading,[5] the error of sustaining its objections is harmless. It points to the fact that defense counsel later elicited from Porter testimony that on the date in question he did not meet Sandy Tavanis.
Were that the end of the matter, we might agree with the State that the defendant was not sufficiently prejudiced to warrant reversal. But the matter did not end there.
In closing argument the prosecutor remarked:
"Consider Mr. Porter's own testimony and the questions his lawyer asked him. The only thing that Mr. Porter said was, `I didn't meet Sandra Tavanis at the bar on November 14th.'
"Well, certainly he wasn't introduced to her as Sandra Tavanis. Certainly, he wasn't introduced to her as a police officer.
"He never denied making any sale, and he never denied not being at the bar." (Tr. 226-227).
.....
"This man has not denied selling heroin on that day.
"MR. SANDBERG [defense counsel]: Objection, your Honor. This is 
"THE COURT: Sustained.
"MR. GINSBURG [the prosecutor]: The only testimony you heard was that on November 14th, he did not meet Sandra Tavanis... ." (Tr. 241-242).
It is apparent, then, that the State's position was that the defendant's denial of meeting Tavanis on November 14, 1975, did not bring within its ambit a denial of selling heroin to her. Having taken that position, the State can hardly argue here that precluding the defendant from denying the sale was harmless in light of his denial of the meeting.
The second ground upon which we reverse Porter's conviction is that the trial court improperly limited his cross-examination of Tavanis.
The theory of the defense was that it was not the defendant who sold heroin to Tavanis. Obviously, the officer's ability to identify the defendant was critical to the defense. Tavanis had never seen Porter before the night in question. She admitted that due to the limited length of time she had to observe the defendant, she took special note of the area around his eyes and cheekbones. Her view of the defendant was limited to a half to three-quarter profile, since he did not directly face her. Her written description of the defendant failed to disclose prominent scars on the side and middle of the defendant's forehead which he had had for many years.
To test Tavanis' memory, ability to observe, and overall credibility, the defense inquired:
"Q. How many drug transactions were you involved in on that day?
"A. That was the only one that I had that day.
"Q. How many drug transactions were you involved in within that general period of time, within three weeks either way of that case?"
The prosecutor's objection to the last question was sustained by the trial court.[6]
*1213 The right of full cross-examination is absolute, and the denial of that right is harmful and fatal error. Coxwell v. State, 361 So.2d 148 (Fla. 1978); Coco v. State, 62 So.2d 892 (Fla. 1953). Cross-examination is the principal means by which a witness' perceptions and memory are tested, Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and its vital importance is even clearer when the cross-examination is of the key prosecution witness. Stripling v. State, 349 So.2d 187 (Fla. 3d DCA 1977); Truman v. Wainwright, 514 F.2d 150 (5th Cir.1975). Where, as in the present case, positive identification is made under circumstances of questionable reliability, the need for full cross-examination is further heightened.
"The necessity for full cross-examination is particularly acute when its purpose is to demonstrate the lack of credibility of an identification by attempting to determine whether or not the witness had recollection of specific characteristics of the defendant. It is axiomatic that the identification of a suspect at a much later time by witnesses who have seen the actual criminal on only a few occasions and then only for short periods is fraught with dangers because of the fallibility and suggestibility of human memory." United States v. Fitzpatrick, 437 F.2d 19, 23 (2d Cir.1970).
The cross-examination upon which the defendant had embarked and which was thwarted by the trial court's ruling was one designed to elicit that Tavanis had, in the weeks surrounding the incident, made numerous undercover contacts and purchases of assorted contraband in situations similar to the present case; and that during the course of these activities she saw many persons for the first time and for limited periods of time. Such an examination, if permitted, could have effectively tested, and perhaps undermined, her ability to remember Porter as the person she dealt with on November 14, 1975, and from whom, as she stated, she bought a quantity of heroin.
The delay in arresting Porter, of course, exacerbated the need for this examination. A defendant who is arrested months after the incident and then called upon to remember his whereabouts and the events of a particular day may often be left with only a feeble and uncorroborated denial of the crime. State v. Griffin, 347 So.2d 692 (Fla. 1st DCA 1977); Woody v. United States, 370 F.2d 214 (D.C. Cir.1966); Ross v. United States, 349 F.2d 210 (D.C. Cir.1965).[7] Such a defendant should, at least, be accorded the right to test the accuracy of the identification made by his principal accuser.
Since a new trial is being afforded the defendant,[8] we will merely note in passing our disapproval of the prosecutor's insidious efforts to prejudice the defendant by eliciting, under the guise of establishing identity, testimony that Porter was a well-known object of their drug investigation; the prosecutor's suggestions that the defendant's story was at worst a lie and at best a smoke screen; and other prejudicial harpoons.[9] *1214 We are confident that when Porter is brought to trial for a third time, the prosecutor will observe the admonition that it is his duty "not to obtain convictions, but to seek justice, and he must exercise that responsibility with the circumspection and dignity the occasion calls for." Cochran v. State, 280 So.2d 42 (Fla. 1st DCA 1973). See also Glassman v. State, 377 So.2d 208 (Fla. 3d DCA 1979).
Reversed.
NOTES
[1] Porter v. State, 347 So.2d 449 (Fla.3d DCA 1977).
[2] Fourteen questions covered in three transcript pages.
[3] Professor Wigmore's treatise contains a humorous account of an "after dinner trial" at Old Bailey which illustrates the vice of the leading question. The defendant's trial, including the verdict and imposition of a seven-year sentence, lasted two minutes, fifty-three seconds. The prosecution's case consisted of a question to the pickpocketing victim, "I think you were walking up Ludgate Hill on Thursday 25th, about half-past two in the afternoon and suddenly felt a tug at your pocket and missed your handkerchief, which the constable now produces"; and a question to the constable, "Were you following the [victim] on the occasion when he was robbed on Ludgate Hill, and did you see the prisoner put his hand into the [victim's] pocket and take this handkerchief out of it?" Both witnesses answered "Yes, sir," and the trial was over. 3 Wigmore, Evidence § 769 (Chadbourn rev. 1970) at 156.
[4] There is a dearth of authority on the subject of whether the "did-you-do-it" question, asked of the defendant on direct examination in a criminal case, is leading. This scarcity is probably explained by the fact that most prosecutors do not have the temerity to interpose this objection. In general, no objections are more frivolous than those which are made to questions as leading ones. Nicholls v. Dowding, 1 Stark 81 (1815). Objections to questions as leading are generally captious and not intended to subserve the ends of justice. Towns v. Alford, 2 Ala. 378 (1841). Surely the ends of justice are not subserved by objecting to the defendant denying the crime with which he is charged.
[5] The State is obdurate in its insistence that the questions were leading. It suggests that since defense counsel obviously expected his client to give a negative answer to the question, it is therefore leading. Of course, this expectancy does not make the question leading. If this were so, then all questions asked by counsel who had interviewed or deposed witnesses beforehand would be leading. At oral argument the State, eschewing inconsistency, conceded that the prosecutor's question to the police officer, Tavanis, "Did [the defendant] give you anything?" (calling for a yes or no answer with the expectancy that it would be answered affirmatively) was leading. The difference, said the State, was that defense counsel had not objected.
[6] The prosecutor, solicitous of protecting the rights of the defendant, argued that to allow testimony of other drug investigations conducted by Tavanis would inject into the trial irrelevant narcotics dealings.
[7] In these cases, the delay in the defendant's arrest, occasioned by continued undercover activity of the officer, resulting in the defendant's inability to effectively explain his whereabouts or activities on the alleged date of the incident, was held to be a denial of due process warranting dismissal of the charges.
[8] Because of our disposition of this case, we do not address the point that the convictions of Porter for possession and sale of the same controlled substance cannot both stand. Mahaun v. State, 377 So.2d 1158 (Fla. 1979); State v. Pinder, 375 So.2d 836 (Fla. 1979).
[9] E.g., on cross-examination the defendant stated that he was previously convicted but could not remember the exact number of times. In closing argument, the prosecutor said, "I asked how many times and he didn't remember. What ... kind of person doesn't remember how many times ...?" Again, the State defends the propriety of this remark as being one directed to the defendant's bad memory. We think it more plausible that the prosecutor was suggesting that the kind of person who would not remember was not one with a bad memory, but one whose criminal record was so long that it is likely he committed the crime for which he was on trial.