553 So.2d 750 (1989)
Catherine Sue FREEZE, Appellant,
v.
STATE of Florida, Appellee.
No. 87-02576.
District Court of Appeal of Florida, Second District.
December 15, 1989.
*751 James Marion Moorman, Public Defender, and Stephen Krosschell, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
ALTENBERND, Judge.
The defendant appeals her judgments and sentences for aggravated child abuse and first-degree felony murder. At her trial, a jury determined that Ms. Freeze had repeatedly and severely beaten her eighteen-month-old son, Kenny, during the days following Christmas, 1985, and thus was guilty of aggravated child abuse. Additionally, the jury determined that she had violently shaken her young son on January 6, 1986 to punish him. Because the shaking had resulted in the child's death on January 8, 1986, the jury convicted her of first-degree felony murder. The trial court entered judgment on both counts and sentenced Ms. Freeze to life imprisonment with a minimum mandatory sentence of twenty-five years on the felony murder charge, and to a concurrent sentence of fifteen years on the aggravated child abuse charge.
On appeal, the defendant maintains that she was entitled to a judgment of acquittal on both charges and that the fifteen year sentence was an improper departure sentence. We affirm the judgments and the life sentence for first-degree felony murder. We also affirm the judgment for aggravated child abuse, but vacate the departure sentence because the scoresheet does not contain any written reasons for departure.

I. EVIDENCE SUPPORTING GUILT
Ms. Freeze had traveled from Ohio to Florida sometime in December, 1985. She testified that she left Ohio because her boyfriend, Roy Harris, was abusing her and stealing her children's food. Other witnesses confirmed that Mr. Harris had abused Ms. Freeze, and that he had broken Kenny's leg by falling on him.
Ms. Freeze came to Fort Myers, Florida, with a new companion, Lester Payne. Ms. Freeze brought Kenny and his four-month-old brother. Mr. Payne brought his eight-year-old son. The group had limited funds and moved into an inexpensive motel while they looked for more permanent accommodations.
On January 6, 1986, Ms. Freeze spent much of the day with Kenny. While Ms. Freeze gave several different statements describing the events of that day, the jury was entitled to believe a version which she told to a member of Lee County's child *752 protection team shortly after the child died. In that statement, Ms. Freeze explained that she had spent most of the day at the food stamp office and that Kenny had been "fussy" throughout the day. When they returned to the motel in the evening, she had a verbal argument with Mr. Payne. Thereafter, the group sat down to eat pizza. Kenny again became fussy when she told him that he could not have a soft drink. He bit her when she would not give him a soft drink. She was trying to teach him not to bite people, so she shook him until he vomited. Thereafter, he became unconscious and went into respiratory arrest. In describing this incident to the member of the child protection team, she explained that Kenny was "a brat," that he "always got his way," and that he "ran her life."
When the child lost consciousness, he was taken to a hospital in an ambulance. At the hospital he was diagnosed as suffering from whiplash shaken infant syndrome. Whiplash shaken infant syndrome is a medical diagnosis first discussed by Dr. John Caffey in 1974.[1] As explained by the experts at trial, a young child has a relatively heavy head and weak neck muscles. As any new parent has observed, for example, a young infant cannot even support the weight of its own head. If a young child is grabbed by the upper arms and forcefully shaken, the child may sustain a whiplash-type injury. If this action is sufficiently forceful, the child's brain may crush against the inside of the skull. This can cause bleeding inside the brain and swelling of the brain. If the swelling is sufficiently severe, the child goes into a coma. The swelling in the brain can force the brain through the natural opening at the base of the skull. This causes respiratory arrest and, ultimately, death. As explained by the medical experts, this is essentially the process which killed Kenny.
Prior to Kenny's death, the physicians and other witnesses at the hospital observed that he was badly bruised. There is direct medical evidence in this case that Kenny had bruises on virtually every portion of his body. Experts estimated that this child had bruises over 75% to 80% of his body. Based on the child's autopsy, the medical experts established that some of the bruises were deep bruises which involved hemorrhages throughout the entire layer of subcutaneous fat and into the underlying muscle. The medical experts testified that these injuries were not consistent with the normal bruises a child would receive in a typical fall. They testified that the bruises were of relatively recent origin, but that they had been inflicted over a period of several days. The doctors concluded that these injuries could only have been produced if the child had been struck many times and occasionally with great force.
Ms. Freeze testified that she did not beat her son. She claimed that the injuries stemmed from beatings the child received in November in Ohio by Mr. Harris, from beatings inflicted in the recent past by Mr. Payne, and from falls or other normal childhood accidents. At trial, she also claimed that Kenny was fatally shaken by Mr. Payne rather than by her.
During the state's case, Mr. Payne testified that he had neither struck nor shaken the child. While he did not testify that all of the bruises on Kenny had been inflicted by Ms. Freeze, he did state that he had seen her hit the child on more than one occasion, and that he had warned her against this type of punishment. He denied that he was even in the motel room when the shaking occurred. The motel manager confirmed that Mr. Payne had been outside working on a car shortly before the manager learned of the problem. An examination of Mr. Payne's own son by the Department of Health and Rehabilitative Services revealed no abuse.

II. AGGRAVATED CHILD ABUSE
Ms. Freeze argues that the trial court should have granted her motion for judgment *753 of acquittal on the charge of aggravated child abuse because the evidence failed to rebut her claims that some other person inflicted the bruises or that the bruises were the result of normal accidents. We disagree.
The expert medical testimony provided sufficient evidence to rebut Ms. Freeze's claim that the bruises were caused by accident or by Mr. Harris. The bruises were too recent to have been inflicted by Mr. Harris, and too severe to have resulted from normal childhood accidents. Concerning her claim that Mr. Payne caused the injuries, the jury was entitled to evaluate his credibility, weigh the additional circumstantial evidence, and reach its own decision. See State v. Law, No. 69,976 (Fla. July 27, 1989) [14 F.L.W. 387].
In sentencing the defendant on this charge, the trial court departed upward without written reasons. The transcript of the sentencing hearing establishes that the trial court intended to depart on grounds that the first-degree felony murder, as a capital offense, was not calculated into the scoresheet. While an unscored capital offense is a valid reason for an upward departure, Davis v. State, 493 So.2d 82 (Fla. 1st DCA 1986), we cannot affirm the sentence when the oral reason has not been reduced to writing. State v. Jackson, 478 So.2d 1054 (Fla. 1985).

III. WHIPLASH SHAKEN INFANT SYNDROME AS A SUFFICIENT GROUND FOR FIRST-DEGREE FELONY MURDER
Ms. Freeze's remaining issue on appeal requires a more thorough examination. She maintains that the state failed to present sufficient evidence to establish that she had the specific intent to commit the aggravated child abuse which resulted in the child's death.
The state is empowered to charge a person with first-degree felony murder if a child dies as a result of the person's act of aggravated child abuse. § 782.04(1)(a)2.h., Fla. Stat. (1985); Mapps v. State, 520 So.2d 92 (Fla. 4th DCA), review denied, 528 So.2d 1182 (Fla. 1988). It is not necessary for the state to prove that the defendant had a premeditated design or intent to kill in order to establish the first-degree felony murder charge.
In order to establish aggravated child abuse, however, it is necessary for the state to prove specific intent. State v. Harris, 537 So.2d 1128 (Fla. 2d DCA 1989); Jakubczak v. State, 425 So.2d 187 (Fla. 3d DCA 1983). Thus, the state was required to present a prima facie case that Ms. Freeze had, with specific intent, "willfully tortured" or "maliciously punished" the child, or that the shaking constituted aggravated battery. § 827.03, Fla. Stat. (1985). Contrary to Ms. Freeze's argument, it was not essential for the state to establish that she specifically intended to kill her son. The state was obligated in this case merely to present sufficient evidence that Ms. Freeze specifically intended to maliciously punish Kenny.
The dividing line between permissible punishment and malicious punishment is not always easy to draw. See Moakley v. State, 547 So.2d 1246 (Fla. 5th DCA 1989) (striking daughter with leather belt on buttocks and hip is not malicious punishment); Toronto v. State, 525 So.2d 932 (Fla. 4th DCA 1988) (Walden, J. dissenting). See also Faust v. State, 354 So.2d 866 (Fla. 1978) ("malicious punishment" not unconstitutionally vague). A defendant "maliciously" punishes a child if the punishment is imposed "wrongfully, intentionally, without legal justification or excuse." Fla.Std. Jury Instr. (Crim.) § 827.03. The element of malice requires evidence that the defendant acted with "ill will, hatred, spite, [or] an evil intent." State v. Gaylord, 356 So.2d 313, 314 (Fla. 1978). "The determination that a parent, or one standing in the position of a parent, has overstepped the bounds of permissible conduct in the discipline of a child presupposes either that the punishment was motivated by malice, and not by an educational purpose; that it was inflicted upon frivolous pretenses; that it was excessive, cruel or merciless; or that it has resulted in `great bodily harm, permanent disability, or permanent disfigurement'." *754 Kama v. State, 507 So.2d 154, 156 (Fla. 1st DCA 1987).
Ms. Freeze argues that the testimony established that she has only a tenth grade education and is of less-than-average intelligence. She forcefully maintains that the state did not prove her specific intent because the state did not prove that she had any knowledge or appreciation of this modern medical diagnosis or the severe physical consequences of child shaking. Thus, she concludes that she was entitled to a judgment of acquittal on the first-degree felony murder charge and should have been tried, at worst, on second-degree or third-degree murder, or upon manslaughter. We disagree.
The doctors who testified at trial were hesitant to state the exact degree of force or violence which is necessary to induce this injury. At least one of the physicians, however, testified that this whiplash-type injury requires vigorous shaking with the head bouncing back and forth multiple times. Thus, the jury was entitled to conclude that this shaking was unusually vigorous and extended. This is supported by Ms. Freeze's own statement that she shook the child until he vomited.
There is clear evidence that the shaking was merely the culmination of an extended period of violent punishment. If this were a case in which there was no other evidence of child abuse and it appeared that the mother had simply shaken her child on one occasion without any conscious thought concerning the action, we would be inclined to agree that the required specific intent had not been proven. In this case, however, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that the punishment was not motivated by educational purposes but rather by spite, ill will, hatred, and an evil intent. The weight of the evidence on this disputed issue of intent was a matter for the jury to resolve. Herbert v. State, 526 So.2d 709 (Fla. 4th DCA), review denied, 531 So.2d 1355 (Fla. 1988); Cochran v. State, 547 So.2d 928 (Fla. 1989). We affirm the conviction for first-degree felony murder and the accompanying life sentence.

IV. CONCLUSION
We assume that Ms. Freeze regrets her decision to violently shake her son and mourns his loss. Neither a mother's tardy regrets, a jury's verdict, nor this opinion, however, can bring Kenny back to life. The Department of Health and Rehabilitative Services has recently reported that 11% of all children killed by child abuse in Florida between January 1986 and June 1989 were the victims of whiplash shaken infant syndrome.[2]
Hopefully, this case and Kenny's tragedy will serve to warn parents that violently shaking a young child is just as lethal as beating an infant. Shaking a young child can result in neurological damage, retardation, or death to the child.[3] If done maliciously, it can also result in life imprisonment for the parent.
Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.
SCHOONOVER, A.C.J., and THREADGILL, J., concur.
NOTES
[1] Caffey, Whiplash Shaken Infant Syndrome: Manual Shaking by Extremities with Whiplash Induced Intracranial and Intraocular Bleedings, Linked with Residual Permanent Brain Damage and Mental Retardation, 54 Paediatrics 396 (1974).
[2] Florida Protective Services System, July 1988-June 1989 Annual Report (1989).
[3] Eagan, Whelan-Williams, Brooks, The abuse of infants by manual shaking: medical, social and legal issues, 72 J.Fla.Med.A. 503 (1985).