757 So.2d 1246 (2000)
Brian SLOCUM, Appellant,
v.
STATE of Florida, Appellee.
No. 4D99-0028.
District Court of Appeal of Florida, Fourth District.
May 10, 2000.
*1247 Michael K. Spotts, and Karen M. Dobbins of Kohl & Spotts, P.A., Stuart, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, Steven R. Parrish, and Leslie T. Campbell, Assistant Attorneys General, West Palm Beach, for appellee.
GROSS, J.
On Saturday morning, October 18, 1997, two-year-old Brittany Vinson drowned in her pool. The state's theory of the case was that appellant Brian Slocum, angered by the child's misbehavior, strapped her into her car seat and kicked her into the pool, not removing her until she was dead. The defense theory was that Brittany drowned by accident.
The eighteen-year-old appellant lived with his girlfriend, Christina Vinson, and two of her young children, Brittany and infant Cody. Also living in the house were Tabitha Tinsley, her two-year-old son Ryan, and Tabitha's boyfriend, Tommy Lawston. Appellant moved into the house the day after Christina Vinson's husband moved out. Appellant had lived with Christina only two days before Brittany's death.
Crucial to the state's case were the statements appellant made to various police officers. Officer Neitzel was the first to respond to the scene. She arrived at 10:00 a.m. When she interviewed appellant, he provided the following version of the facts: He had gotten up with baby Cody around 7:45 a.m. and noticed that Brittany and Ryan were still asleep. He went back to the room he shared with Christina and played with Cody until almost 10:00 a.m. Upon leaving the bedroom, he saw Ryan sitting on the couch with a blank look. When he asked Ryan where Brittany was, Ryan said she was in the pool. Appellant found Brittany floating in the pool and told Christina to call 911. He mentioned nothing about a car seat.
Officer Izzo arrived at the house around 10:15 a.m. Appellant told the officer that *1248 he had gotten up around 8:30 a.m., lain in bed about 20 minutes, and then went to check on the children. He saw Ryan watching television. Ryan told appellant that Brittany was in the pool. Appellant found her floating face down in the deep end. He told Christina to call 911 and carried Brittany to the couch where he tried to administer CPR.
Shortly after Brittany's death, another incident occurred at the house. Tommy Lawston slashed the throats of Christina and appellant with a knife. On October 21, 1997, Detective Schrader went to the hospital to see appellant regarding the knifing incident. After first talking about the slashing, they spoke of Brittany's death. When the detective implied that appellant was involved in the child's demise, appellant became upset and told the detective to leave.
On November 1, 1997, Detective Schrader went to where appellant was living in reference to a matter involving the Department of Children and Family Services and appellant's six-month-old daughter. At that time, appellant's attitude had changed. He apologized for the way he had acted at the hospital and said that he wanted to talk to the detective. As the detective testified, appellant
said that I knew where he lived; I could stop by any time that I wanted to, and if I ever wanted for him to come into the police department to talk to me, he would be more than willing to.
Appellant defied his mother in speaking with the detectives; he told her that he was 18 and could talk with whomever he wanted.
Detective Schrader subsequently spoke with appellant over a period of days for a total of 20 to 24 hours. For these interviews, appellant voluntarily came to the police station to talk. He took many breaks for cigarettes, soft drinks, and the lavatory. He was aware that he was free to leave at any time. For example, On November 7, he went home to get a pack of cigarettes and returned to the police station. He could move around at will and was never told he had to stay at the station. The interviews were videotaped and recorded. Appellant only knew of the taping of the last interview. Appellant was not read his Miranda rights during any of these sessions.
The tape of November 12, 1997 was played for the jury. The tape was not transcribed by the agreement of the parties, but was included in the record. A viewing of the videotape reveals that appellant was a young man with brown hair. He wore jeans, a Nike t-shirt, and tennis shoes. His body language, facial expressions, and intonation were relaxed. Immediately, he said he voluntarily came to the station that day and knew he was free to leave at any time. He stated that he had talked with the detectives freely and voluntarily for six days.
His reason for doing so was to remember or find out what happened to Brittany. Appellant even said that at the most recent interview, he did not want to leave and was there on "my own free will." One of the detectives joked that at the last interview, appellant wanted to take them out to dinner. Appellant said he wanted to find the "missing piece of the puzzle." He analogized his situation to a mystery: "I have the key, key is in the door, but I haven't unlocked it yet."
As it turns out, appellant remembered that Brittany had gotten on his nerves, so he strapped her into her car seat and kicked the car seat into the pool. Defendant said he was 95% sure he kicked her, almost 100% positive. He said he was 99% sure Brittany did not strap herself into the car seat. Afterwards, realizing Brittany was dead, defendant panicked. He went about "staging the incident." He thought the detectives could sympathize with him because they had children. He took Brittany out of her car seat and put her back in the pool. He cleaned up the water on the floor that had come from the pool when he had lifted out the car seat; he *1249 then cleaned up the car seat and put it in the garage.
The phone rang. Appellant answered it after approximately 5-7 rings. It was Christina's mother. He brought the phone to Christina, still not "aware" of what he was doing. Appellant then saw Ryan on the couch and asked him where Brittany was. Ryan said, "in his own little way," "Brittany pool." Appellant then went out to the pool and "found" Brittany floating. He carried her inside to the couch and told Christina to get off the phone and call 911. As appellant summarized, "the rest is history."
Throughout the taped interview, appellant expressed regret for Brittany's death. He smiled and joked with Detectives Schrader and Griffith, whom he called by their first names. For example, he made pleasantries about his smoking habit, dogs wanting to go outside, about one of the detectives "not being a dick" for "once in [his] life," and mainly about being scared to tell his girlfriend, Christina, what happened. Appellant said it was "definitely an oh shit" moment when he realized Brittany was dead. Appellant explained that he "staged" the scene not for himself, but to protect Christina, the woman he loved.
At the end of the tape, when the detectives asked appellant if what he had told them was the truth, defendant grabbed a nearby paperback dictionary, pretending it was a bible, and swore on it that he had told the truth. He joked about "Perry Mason over here" to one of the detectives. At one point during the tape, one of the detectives checked to see if the recorder was working and appellant said "please tell me we are recording."
At all times on the tape, appellant was coherent, intelligent, and articulate. In fact, at one point appellant asked rhetorically, "Why am I being so articulate?" as an inside joke he had with the detectives. At no time did appellant express in any way that he wanted to leave or that he was being forced to talk with the detectives.
During his examination of Detective Schrader, defense counsel elicited testimony that some people are more suggestible than others during the interview process and these people may include older or younger age groups. The detective agreed that people might intentionally lie during an interview and that he does not always get the truth. The detective agreed that he might get information which he thinks is accurate, but later learns is incorrect. Defense counsel then specifically asked:
Q: Okay. Have you ever made a mistake in reaching a conclusion based on an interview that you later found to be not sustainable?
A: Yes, sir.
Q: Has that ever happened in a first degree murder case?
A: No, sir.
Q: Okay. Have you ever been involved in any interviews of someone that was arrested for a first degree murder case, but later, was found to be not that person?
State: Objection, Your Honor. I don't see the relevance in this.
At a sidebar conference, defense counsel explained his theory of relevance:
My intention is that just within the last year or so, [Detective Schrader] was involved with Detective Griffith in exactly the same interviewing process, that arrested an elderly gentleman for first degree murder. He spent 28 days in the county jail, then, I think, it was determined that he was innocent; the real murderer killed someone else and he was arrested. I don't want to get into all the facts, but there certainly are similarities in their questioning procedures. There was [sic] five days of this using the same scenarios, possibilities, which are exactly what they did in that case. All I want to ask him if that's ever happened; whether he's ever made a mistake. And that, I think, is the real reason.
*1250 The state responded that this line of questioning was irrelevant. The court agreed, ruling that questioning about the other homicide case was "getting off the facts of this case" and going "too far afield." The court limited this aspect of the cross-examination to the broad question of whether the detective had ever made a mistake in other cases.
Thereafter, defense counsel questioned the detective:
Q: All right. Detective Schrader, you have made mistakes in the past; correct?
A: Correct.
Q: All right. Leave it there.
Dominic Guzzi, an inmate at the St. Lucie County Jail when appellant was there, supported the state's theory of the case. The two men became friendly in the jail. One night, appellant told Guzzi what happened. As explained by Guzzi:
Brittany and Slocum and another child were out back behind the house, by the pool. Brittany and the other child were fighting. He had tried to get them to stop fighting and he separated them, trying to separate them from fighting. He placed Brittany in the car seat. And, in turn, she didn'tI guess she didn't like that. She was trying to get out, he said, and she was fighting, tryingyou know, with the straps, trying to get out, spazzing out.
. . .
[Defendant] kept telling her to shut up and be quiet, and he said she was getting on his nerves. And he kicked the car seat and proceeded to ask her, "Do you want to go into the pool?"
. . .
He then, enraged, kicked her in the pool; and the car seat, with her strapped in, fell into the pool.
Guzzi testified that appellant told him he did not get Brittany out of the pool because he was "in shock." Appellant then said that when he finally got Brittany out of the pool, he took her out of the car seat and threw her back in the pool. He then brought the car seat into the garage and went into the house. He saw another child inside who said "Brittany in pool." Defendant then went back out to the pool, retrieved Brittany and brought her into the house. This conversation took place at the end of November, but Guzzi did not contact the authorities until December 18, when he was in the Martin County Jail.
Appellant contends that the trial court erred in restricting his questioning of the detective about the specifics of the interrogation process in an unrelated homicide case which resulted in the confession and arrest of an elderly man for first degree murder, who was later determined to be innocent.
The proposed cross-examination does not fit into any of the broad categories of impeachment contained in section 90.608, Florida Statutes (1999). The crux of the trial court's ruling was that the details of the other homicide case were not relevant to this one. "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (1999). At trial, appellant sought to prove that his November 12 statement to the police was an unreliable indicia of his guilt. The probative force of the unrelated case involving an elderly man would have turned on a number of factors, including a comparison of the interrogation techniques and an analysis of the two suspects' personalities to determine both their susceptibility to the techniques used and whether there was sufficient similarity between them to permit the conclusion that in this case there was a false confession.
There was no error in the restriction of cross-examination on this issue. A trial judge has broad discretion in determining the relevance of evidence. See Chaudoin v. State, 707 So.2d 813, 815 (Fla. 5th DCA 1998). As the supreme court has observed:
The United States Supreme Court has stated that "trial judges retain wide latitude *1251 ... to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); see also State v. Ford, 626 So.2d 1338, 1347 (Fla.1993). Limitation of cross-examination is subject to an abuse of discretion standard.
Moore v. State, 701 So.2d 545, 549 (Fla. 1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998) (citations omitted).
To open the door to evidence about an unrelated case was to create a trial within a trial; there was a risk that the trial would be needlessly lengthened and that the additional evidence would obscure the discovery of the truth. See § 90.612(1), Fla.Stat. (1999). To have stepped into the quicksand of the other homicide case would have sunk this trial into litigation over the myriad details of a completely unrelated homicide. Even relevant evidence is inadmissible if "its probative value is substantially outweighed by the danger of ... confusion of issues [or] misleading the jury...." § 90.403, Fla. Stat. (1999). We find no abuse of discretion in the trial court's refusal to permit cross-examination concerning the unrelated homicide case.
We distinguish this case from Henry v. State, 688 So.2d 963 (Fla. 1st DCA 1997), Mendez v. State, 412 So.2d 965 (Fla. 2d DCA 1982), and Porter v. State, 386 So.2d 1209 (Fla. 3d DCA 1980). As the supreme court has summarized the case, Mendez
reversed a conviction of attempted second-degree murder of a policeman where the officer victim/witness had been the subject of numerous internal investigations, and had been suspended, for beating a suspect, for stealing a gun from another officer, and for pulling a revolver on a student who committed a traffic infraction. The district court correctly concluded that the officer's prior use of excessive force was relevant to his bias and motive for testifying and that the jury should have been made aware of his past conduct.
Breedlove v. State, 580 So.2d 605, 608 (Fla. 1991). Similarly, Henry authorized cross-examination of a police officer concerning prior shooting incidents because they demonstrated "bias or possible motive" on the part of the officer to lie in a case where it was alleged that he used excessive force. See 688 So.2d at 966. In this case, the proposed cross-examination did not pertain to the detective's bias or motive for testifying.
Porter involved a conviction for sale and possession of heroin. The defendant was arrested two months after the sale. The theory of defense was that it was not the defendant who had sold heroin to the undercover officer. The defense was precluded from questioning the undercover officer about the number of drug transactions she was involved in around the time of the sale. The third district held that this restriction of cross-examination was error, since it was proper to test the officer's "memory, ability to observe, and overall credibility." 386 So.2d at 1212. In this case, the excluded cross-examination did not relate to the detective's ability to "observe, remember, or recount" the matters about which the detective testified. See § 90.608(4), Fla. Stat. (1999).
Concerning another point raised by appellant, the evidence at trial was sufficient to support a conviction of first degree murder under a felony murder theory. A first degree murder conviction is proper if a child dies as a result of the defendant's act of aggravated child abuse. See § 782.04(1)(a)2 h, Fla. Stat. (1999). To establish aggravated child abuse, the state must prove that the defendant either: 1) committed aggravated battery on a child; 2) willfully tortured, maliciously punished, or willfully and unlawfully caged a child; or 3) knowingly and willfully abused a child and in so doing caused great bodily *1252 harm, permanent disability, or permanent disfigurement to the child. See § 827.03(2), Fla. Stat. (1999).
A battery is "aggravated" when the defendant "[i]ntentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement." § 784.045(1)(a)1, Fla. Stat. (1999); Washington v. State, 737 So.2d 1208, 1217 (Fla. 1st DCA 1999). Intent is usually a jury question. See id. In Washington, an infant sustained extensive internal and external injuries and died. The state presented evidence that the defendant was the victim's sole custodian during the playground visit and that the injuries could have been inflicted in anywhere from 10 seconds to 45 minutes. The evidence suggested that a change in technique and position of the defendant's hands would have been required to inflict the different types of injuries and that pauses necessary to make the changes would have allowed the defendant time to reflect. The court held that "[g]iven the varied and extensive nature of the brutal injuries to the 11-month-old victim, we find ample support for sending the question to the jury under the State's felony murder theory." Id.
Regarding another conduct element of aggravated child abuse, "[t]he dividing line between permissible punishment and malicious punishment is not always easy to draw." Freeze v. State, 553 So.2d 750, 753 (Fla. 2d DCA 1989) (citation omitted). "A defendant `maliciously' punishes a child if the punishment is imposed `wrongfully, intentionally, without legal justification or excuse.'" Id. (citation omitted). "The element of malice requires evidence that the defendant acted with `ill will, hatred, spite, [or] an evil intent.'" Id. (quoting State v. Gaylord, 356 So.2d 313, 314 (Fla.1978)).
"The determination that a parent, or one standing in the position of a parent, has overstepped the bounds of permissible conduct in the discipline of a child presupposes either that the punishment was motivated by malice, and not by an educational purpose; that it was inflicted upon frivolous pretenses; that it was excessive, cruel or merciless; or that it has resulted in `great bodily harm, permanent disability, or permanent disfigurement.'"
Id. (quoting Kama v. State, 507 So.2d 154, 156 (Fla. 1st DCA 1987)) (footnote omitted in Freeze) (emphasis supplied).
Here, strapping a two-year-old who is terrified of the water into a car seat and kicking the car seat into a pool constitutes malicious punishment within the meaning of the statute. The jury might also have found that appellant knowingly caused great bodily harm to a child. As in Washington, defendant was the sole custodian of Brittany. Her death took minutes. From the time defendant kicked the car seat to when Brittany actually died, appellant had sufficient time to reflect.
Finally, we agree with the trial court that appellant was never in custody during his statements such that Miranda warnings were required. See Ramirez v. State, 739 So.2d 568, 573 (Fla.1999), cert. denied, ___ U.S. ___, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000); Caso v. State, 524 So.2d 422, 423-24 (Fla.1988). Also, we find no merit in appellant's corpus delecti argument.
AFFIRMED.
DELL and POLEN, JJ., concur.