776 So.2d 906 (2000)
Andrew LUKEHART, Appellant,
v.
STATE of Florida, Appellee.
No. SC90507.
Supreme Court of Florida.
September 28, 2000.
Rehearing Denied January 23, 2001.
*910 Nancy A. Daniels, Public Defender and Chet Kaufman, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General and Barbara J. Yates, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Andrew Lukehart. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the convictions of first-degree murder and aggravated child abuse and the sentence of death. However, we remand to the trial court for a resentencing on the aggravated child abuse conviction and direct the trial court to complete the sentencing guidelines scoresheet.

FACTS
The victim in this case, five-month-old Gabrielle Hanshaw, was killed by Lukehart, who lived in Jacksonville with Gabrielle's mother, Misty Rhue, along with Rhue's other daughter, Ashley, and Rhue's father and uncle. On February 25, 1996, Lukehart and Rhue spent Sunday afternoon running errands in Rhue's car with the two children. When the four returned to their house on Epson Lane, Rhue took two-year-old Ashley, who had been ill, to her bedroom for a nap, and Lukehart cared for Gabrielle, the baby, in another room. At one point, Lukehart entered the bedroom and took a clean diaper for the baby. At approximately 5 p.m., Rhue heard her car starting in the driveway, looked out the window, and saw Lukehart driving away in her white Oldsmobile. Rhue searched the house for the baby and did not find her. Thirty minutes later, Lukehart called from a convenience store and told Rhue to call the 911 emergency number because someone in a blue Chevrolet Blazer had kidnapped the baby from the house. After Rhue called 911, Jacksonville Sheriff's Detectives Tim Reddish and Phil Kearney went to the Epson Lane house.
Shortly thereafter, Lukehart appeared without shirt or shoes in the front yard of the residence of a Florida Highway Patrol trooper in rural Clay County. At about that same time, the car that Lukehart had been driving was discovered about a block away from the trooper's house. The car was off the road and had been abandoned with its engine running. Law enforcement officers from the Clay County Sheriff's Office and the Jacksonville Sheriff's Office interviewed Lukehart and searched in Clay County for the baby during the ensuing eighteen hours. At about noon on Monday, February 26, Lukehart told a lieutenant with the Clay County Sheriff's Office that he had dropped the baby on her head and then shook the baby and that the baby had died at Misty Rhue's residence. Lukehart said that when the baby died, he panicked, left Rhue's residence, and threw the baby in a pond near Normandy Boulevard in Jacksonville. Law enforcement officers searched that area and found the baby's body in a pond.
On March 7, 1996, Lukehart was indicted on one count of first-degree murder and one count of aggravated child abuse. The trial was held February 26 and February 27, 1997. During the trial, the State put into evidence the testimony of law enforcement officers who were involved in the search for the baby and who were with Lukehart during the evening of February 25 through the morning of February 26, *911 1996. The State also presented statements made by Lukehart. The State presented the testimony of the medical examiner, who testified that the baby's body revealed bruises on her head and arm that occurred close to the time of death and that prior to death the baby had received five blows to her head, two of which created fractures.
Lukehart chose to testify in his defense at trial. Before Lukehart testified, the trial court appropriately advised him that he had a right not to testify and that if he did testify, he would be subject to cross-examination. In his testimony, Lukehart said that, while he was changing the baby's diaper on the floor at Rhue's residence, the baby repeatedly pushed up on her elbows. He forcefully and repeatedly pushed her head and neck onto the floor "until the last time I did it she just stopped moving, she was just completely still." Lukehart testified to being six-feet one-inch tall and weighing 225 pounds. He stated that he used "quite a bit" of force to push the baby down. He testified that he tried mouth-to-mouth resuscitation, and when the baby did not revive, he panicked and grabbed the baby and drove to a rural area. He said that when he stopped and was in the process of getting out of the car, he accidentally hit the baby's head on the car door. Lukehart testified that he threw the baby into the pond where her body was found. He admitted that he had not told law enforcement officers the truth in his earlier accounts of the incident and that, although he did not intend to kill the baby, he was responsible for her death. He said that he eventually told Lieutenant Jimm Redmond of the Clay County Sheriff's Office that he was responsible for the baby's death and that he had revealed the location of the baby's body because "I felt bad, I felt guilty."
The jury convicted Lukehart of first-degree murder and aggravated child abuse as charged. At the penalty phase, the State established that Lukehart had pleaded guilty to felony child abuse for injuring his former girlfriend's baby and that Lukehart was on probation for that prior felony conviction. By a vote of nine to three, the jury recommended death. In its sentencing order, the trial court found that the following three statutory aggravators had been established: (1) that the murder was committed during commission of the felony of aggravated child abuse; (2) that the victim was under twelve years of age; and (3) that appellant had a prior violent felony conviction and was on felony probation (two factors merged). The trial court also found and gave some weight to the statutory mitigators of Lukehart's age (twenty-two) and his substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The court found and gave some weight to the following nonstatutory mitigators: Lukehart's alcoholic and abusive father; Lukehart's drug and alcohol abuse; Lukehart's being sexually abused and suicidal as a child; and Lukehart's being employed. Finding that aggravators outweighed mitigators, the court sentenced Lukehart to death for the first-degree murder conviction and to fifteen years' imprisonment for the aggravated child abuse conviction.
In this Court, Lukehart appeals his convictions and death sentence and raises twelve claims.[1]

*912 GUILT PHASE

Suppression Claim
Lukehart first contends that the trial court erred in denying his motion to suppress his statements to law enforcement officers. Specifically, he argues that his statements were not voluntary because the officers (1) did not initially advise him of his Miranda[2] rights when he was handcuffed and waiting for detectives to arrive; (2) denied him counsel and interrogated him after his unequivocal request for a lawyer; and (3) coerced his statement regarding his role in the victim's death by advising him repeatedly of his Miranda rights during the investigation, by showing him a picture of the victim, and by referring to the need to find the baby's body in order to have a Christian burial.
Lukehart argues that all of his statements to law enforcement officers were illegally obtained and thus should not have been allowed into evidence at trial. He contends that his exculpatory statements, which the State introduced through law enforcement officers during its case-in-chief and which Lukehart recanted at trial, were harmful because they portrayed Lukehart as a liar and were irrelevant to the manner in which the baby died. He maintains that introduction of his inculpatory statements deprived him of his Fifth Amendment protection against self-incrimination. Therefore, Lukehart asks this Court to grant him a new trial.
In his pretrial suppression motion, Lukehart moved to suppress the statements made to law enforcement officers during the eighteen-hour period beginning the early evening of February 25, 1996, when he walked out of the wooded area in Clay County into the yard of the highway patrol trooper, and ending with his arrest after he led law enforcement officers to the baby's body. Following an evidentiary hearing, the trial court denied the motion. The defense renewed its objection at trial.

Suppression Hearing Testimony
At the pretrial hearing on the motion to suppress, the trial court heard extensive testimony from the law enforcement officers and from Lukehart. We find it necessary to set out that evidence in detail for an accurate understanding of the flow of events during this eighteen-hour period between the death of the baby and Lukehart's statement at about noon the following day that he had caused the baby's death.
This evidence includes the testimony of Florida Highway Patrol Trooper Richard Earl Davis, Jr., who at about 7 p.m. on February 25, 1996, was watching television with his family in his home located in a sparsely populated area in rural Clay County. After hearing a helicopter flying over his house and seeing "the front yard lit up," Trooper Davis called 911 and was told "there was a white male that was in the woods, that they were looking for that possibly abducted a five month old baby." Trooper Davis went outside and almost immediately saw a white male wearing only shorts and tennis shoes "in the ditch coming up toward my house."
That person, who was later identified as Lukehart, said something that Trooper Davis believed was "I'm the one they're looking for." Trooper Davis went back into his house and obtained his gun belt and handcuffs. Trooper Davis returned outside five seconds later and saw the white male still standing with his hands up and heard him repeat, "I am the one they are looking for." Trooper Davis told Lukehart to turn around, and he handcuffed Lukehart's hands. Trooper Davis *913 testified that he did this "for officer safety also, you know, that he said they were looking for him, so that was basically it, I put them on for custody reasons."
Trooper Davis then "asked him where the baby was at." Trooper Davis testified that Lukehart "said he didn't know what the hell [Davis] was talking about, [and to] read him his rights." Trooper Davis did not read him his rights and asked no more questions. He communicated by telephone to law enforcement officers, "I ha[ve] the guy."
Less than a minute after Trooper Davis placed handcuffs on Lukehart, Clay County Sheriffs Deputy Jeff Gardner arrived in his marked patrol car and transported Lukehart away from Trooper Davis's yard. The total time that Lukehart had been under the control of Trooper Davis was estimated by Trooper Davis to be two minutes.
Deputy Gardner testified that around 6 p.m. on February 25, he was sent by his dispatcher to Clay County Road 217 in reference to a vehicle accident. When he arrived at the vehicle scene, he "observed a vehicle approximately 50 feet off the roadway in the woods. It had gone between a telephone pole and the wire." The ignition of the car was still on, the lights on the dash were still on, and the car was in drive. He observed "a baby chair in the back seat on the passenger side and some baby clothes on the floorboard." Deputy Gardner informed his dispatcher of the vehicle license number, and the dispatcher advised him that the vehicle had not been reported stolen. The dispatcher then cross-referenced a telephone number for the vehicle owner, and the dispatcher called this number. The dispatcher advised Deputy Gardner that officers from the Jacksonville Sheriffs Office were at the residence of the vehicle owner.
Deputy Gardner called the telephone number he had been given for the vehicle owner and spoke with a person identified as being with the Jacksonville Sheriffs Office. That person told Gardner that the vehicle had been involved in an apparent abduction and that the vehicle's owner was named Lukehart.[3] That person also told Deputy Gardner that "from what he knew somebody came in and took a five [month] old infant ... right out the door and got into a blue Chevrolet Blazer and took off down the road, and [Lukehart] followed."
About five minutes later, Deputy Gardner was advised by his dispatcher that the owner of the vehicle, Lukehart, was with Trooper Davis at Trooper Davis's residence. That residence was approximately a block from where Deputy Gardner was waiting with the vehicle. Deputy Gardner proceeded to Trooper Davis's residence and arrived there about one minute later. When Deputy Gardner drove up to the house, he saw Trooper Davis standing with Lukehart in front of the house. Deputy Gardner walked up to Lukehart and "asked him what was going on." Lukehart replied, "I don't want to speak to anybody until I see a lawyer." Lukehart then "looked over toward a tree there and said, `I just tried to kill myself.'" Lukehart further stated that he had taken his shirt off, tied it to his neck and also to a limb on the tree, and tried to jump out of the tree in order to hang himself. Deputy Gardner testified that he had noticed a slight redness on Lukehart's neck.
Deputy Gardner said he next asked Lukehart to accompany him back to the place where the abandoned vehicle was found nearby. Deputy Gardner testified that he did not place Lukehart under arrest and he did not at that time have any basis for arresting Lukehart. Lukehart agreed to return to the abandoned vehicle. As Deputy Gardner and Lukehart were traveling the quarter mile to the site of the vehicle, Lukehart pointed to a tree and said, "[T]hat's where I just tried to hang myself." Deputy Gardner testified that, *914 once they arrived at the site of the vehicle, he kept Lukehart handcuffed for Lukehart's own protection because of the suicide threat. The two waited for Deputy Gardner's supervisor to arrive. Deputy Gardner testified that he did not interrogate or question Lukehart during this waiting period. Deputy Gardner said that, while they waited, Lukehart stood outside the patrol car, leaned against the car, and smoked cigarettes that Deputy Gardner had obtained for him. During the waiting period, Lukehart stated, "I wish she hadn't shit in her diaper." Lukehart also said, "[I]t's not going to look good on me now.... I was arrested for child abuse before but I didn't do it."
Deputy Gardner testified that Lukehart also said several times during this period that he wanted to talk with detectives. Detective Lavelle Goff of the Jacksonville Sheriff's Office and Lieutenant Thomas Waugh of the Clay County Sheriff's Office arrived within about an hour, and Deputy Gardner turned Lukehart over to them.
When Deputy Gardner and Lukehart arrived at the place where Lukehart's vehicle had been abandoned, Officer Richard G. Davis of the Jacksonville Sheriffs Office was there with the vehicle. Officer Davis testified that Lukehart was kept in handcuffs because Lukehart said he had tried to commit suicide and that Officer Davis was under the impression that Clay County law enforcement officers were holding Lukehart under the Baker Act.[4] Officer Davis testified that no one tried to question Lukehart after he requested a lawyer. Officer Davis said that Lukehart said: "I guess my girlfriend is going to be mad at me now." Lukehart also asked several times "when was [he] going to get a chance to tell [his] side of the story." Officer Davis said he responded to the statement that "we had some fellow detectives coming out from Jacksonville to talk to him."
Detective Goff arrived at the scene where Lukehart and the vehicle were waiting at about 8 p.m. on February 26, 1996. At the time of this investigation, Detective Goff had been with the Jacksonville Sheriffs Office for twenty-six years and had been a detective for sixteen years. Detective Goff was told that Lukehart's vehicle "had run off the road and was wrecked and that [Lukehart] was being detained at that time." Detective Goff was told that Lukehart had "told Trooper Davis to read him his rights," that Lukehart had asked for a lawyer, and that Lukehart had tried to hang himself with a T-shirt. Detective Goff was then told by another officer at the scene that Lukehart "wanted to talk to a detective."
Detective Goff testified that, after talking with other officers, he walked over to the patrol car where Lukehart was sitting. As to his conversation with Lukehart, Detective Goff testified that he said:
I understand that you want to talk with a detective but I understand also that you asked for a lawyer earlier.
And [Lukehart] said, yes, I did but... I asked for a lawyer because I heard the officers talking about previous arrests.
And [Goff] said well, you know, do you want to talk to us now?
And [Lukehart] said yes, he did.
So at that time [Goff] said well, before I talk to you because you've asked for a lawyer I want to go through your constitutional rights with you. And at that time I advised him of his constitutional rights.
Detective Goff said that he read to Lukehart his full Miranda rights card.[5] During *915 this reading, Lukehart interrupted the reading and said, "I understand my rights," but Detective Goff said he continued to read the rights card word-for-word. Lieutenant Waugh corroborated Detective Goff's testimony concerning his reading of the Miranda rights card to Lukehart.
According to further testimony in the suppression hearing, Detective Tim Reddish of the Jacksonville Sheriff's Office received a call concerning the abduction of the baby and responded first to the home of Misty Rhue on Epson Lane at about 7 p.m. on February 25. He questioned Rhue and her father at that time. Detective Reddish was advised at approximately 8:15 p.m. that Lukehart had been located in Clay County. He went to the scene where Lukehart and his vehicle were located and arrived there about 9 p.m. Detective Reddish testified that he again administered Miranda rights to Lukehart even though he had been told that Detective Goff had already done so "[b]ecause before I spoke to him I wanted to be sure that he understood his rights as well." Lukehart did not ask for a lawyer in Detective Reddish's presence. Detective Reddish stated that the questions he then asked Lukehart pertained directly to the whereabouts of the baby. Lukehart gave him details about a person in a blue Chevrolet Blazer who had fled with the baby.
Detective Reddish transported Lukehart in Reddish's patrol car from the Lukehart vehicle scene in Clay County to Misty Rhue's residence on Epson Lane in Jacksonville. From the Epson Lane house, Detective Reddish transported Lukehart to the Jacksonville Police Memorial Building. Rhue and her father also were taken to the police building. The three of them were separated for interviews. Detective Reddish testified that he removed the handcuffs from Lukehart inside the police building. Lukehart disputed that statement and said the handcuffs were not removed until several hours after he arrived at the police building.
Detective Reddish testified that, prior to interviewing Lukehart at the police building, he again read Lukehart the Miranda rights form. In evidence is a constitutional rights form signed by Lukehart showing the time as 3 a.m. on February 26, 1996. Lukehart did not ask for a lawyer while he and Detective Reddish were at the police building during the morning hours of February 26.
At about 6:45 a.m. on February 26, Detective Reddish and Lukehart left the police building. Lukehart had agreed to retrace the route where he said he had followed the Chevrolet Blazer from the Epson Lane house to the place where his vehicle had left the road in Clay County. At that time, it is undisputed that Lukehart was not handcuffed. Detective Reddish and Lukehart first stopped at a Burger King and ate breakfast. They next stopped at a Wal-Mart store where Reddish bought Lukehart some clothes because the clothes he had been given at the police building did not fit him. Detective Reddish testified that at that time he considered Lukehart to be an eyewitness to an abduction. The two traveled from Epson Lane to the scene where the abandoned Lukehart vehicle was located. The Clay County Sheriff's Office had set up a command post as part of their efforts to search the area for the missing baby. Approximately twenty-five to thirty law enforcement officers were involved. *916 The Jacksonville Sheriffs Office was also conducting an ongoing aerial search for the baby.
At about 10:30 a.m. on February 26, Lieutenant Jimm Redmond of the Clay County Sheriffs Office asked to speak to Lukehart. At about that same time, Detective Reddish was asked to coordinate the air search from the vantage point of the police helicopter because he had pieced together Lukehart's route on the previous day. Detective Reddish left in the helicopter, and Lieutenant Redmond stayed with Lukehart.
Lieutenant Redmond had been with the Clay County Sheriffs Office for fifteen years when he was notified about 5:45 a.m. on February 26 that the search for the baby was being conducted in Clay County. He first came into contact with Lukehart at about 10:30 a.m. that same day. At that time, Lieutenant Redmond was the supervising lieutenant of the Crimes Against Persons Unit of the Clay County Sheriffs Office. He stated that he asked the Jacksonville Sheriffs detectives to allow him to seek from Lukehart additional information to assist in locating the baby or the person in the Chevrolet Blazer who was purported to have abducted the baby. Lieutenant Redmond had been told by his supervisor that Lukehart had witnessed the abduction and had pursued the Blazer but had lost sight of it in Clay County.
When Lieutenant Redmond first came into contact with Lukehart, Lukehart was seated alone in Detective Reddish's patrol car. He was not handcuffed. Lieutenant Redmond entered Detective Reddish's vehicle and sat in the driver's seat. He told Lukehart that he understood that Lukehart had pursued a subject in a blue Blazer who had abducted the baby from Jacksonville, that Lukehart had followed the Blazer into Clay County and had lost sight of it, and that Lukehart subsequently had driven his car off the road.
During this discussion between Lieutenant Redmond and Lukehart, a photograph of the baby was handed into the vehicle to Lieutenant Redmond. Lieutenant Redmond looked at the photograph and then showed it to Lukehart, who said, "[D]on't show me the picture." Lieutenant Redmond asked him for a reason and Lukehart "just said he didn't want to look at the picture." Lukehart did verify that the picture portrayed the baby. Lieutenant Redmond then told Lukehart that he did not believe Lukehart's story about the blue Blazer and that he believed that if Lukehart continued with that story, he would be arrested for murder. He further told Lukehart that it was important to find the baby to get her out of the hot sun, because the family needed closure, and because the baby should have "a decent burial."
Lieutenant Redmond testified that he put the photograph in his breast pocket. Fifteen to twenty minutes later, Lukehart told Lieutenant Redmond that the blue Blazer story was not true. Lukehart said he wanted to tell Lieutenant Redmond the circumstances of the baby's death, but before he did so he wanted to move from the location where the two had been sitting in the patrol car. Lieutenant Redmond and Lukehart then relocated from Detective Reddish's vehicle to Lieutenant Redmond's vehicle, and Lieutenant Redmond drove to a cul de sac less than a quarter of a mile away. Lieutenant Redmond testified as to the statement Lukehart gave as the two sat alone in the patrol car:
Briefly he said that he was changing the baby's diapers, that he was cradling, holding the baby, and that the baby was squirming, he dropped the baby on the baby's head. He told me that he yanked the baby up and he knew he hurt the baby when he did that. Subsequent to that, he shook the baby trying to revive the baby. And said he knew she was dead.
Lukehart then told Lieutenant Redmond the location of the baby's body, which was not in Clay County. Rather, the body was in a pond off Normandy Boulevard in Jacksonville. Lukehart directed Lieutenant *917 Redmond and Detective Reddish to the body. After finding the baby's body, Lieutenant Redmond and Detective Reddish asked Lukehart to sign another Miranda rights form, and Lukehart did so. Lukehart then wrote out a four-page statement describing the events surrounding the baby's death.
According to Lukehart's testimony at the suppression hearing, he was handcuffed much longer than Detective Reddish indicated. Lukehart said that he did first tell Lieutenant Redmond the abduction story, but Lieutenant Redmond told him that he needed to help the police find the baby so the baby could have a Christian burial or, if she was alive, she could receive medical assistance in time to save her. Lukehart said he was crying when Lieutenant Redmond waved the baby's photograph in front of him. Lukehart said that he requested a lawyer several times but admitted that this was before Detective Goff read him the Miranda rights card. Lukehart admitted that he signed the rights form and made the checkmarks on the rights form.

Legal Analysis of Suppression Claim
The first subissue within the suppression claim is whether Lukehart received adequate Miranda warnings. Lukehart argues that all of the statements he made from the moment he first encountered Trooper Davis at approximately 8 p.m. on the evening of the baby's disappearance through his statements that led to the finding of the baby's body the following day should have been suppressed in accord with the decisions of United States Supreme Court and this Court as to Miranda protections against forced self-incrimination. We do not agree.
Here, the trial court found that Lukehart was neither in custody nor being interrogated during the period before he waived his Miranda rights. As to custody, it is undisputed that Lukehart was handcuffed for his own protection because he told Trooper Davis that he had tried to kill himself during an early stage of the investigation prior to his Miranda waivers. In his written statement given to law enforcement officers after his Miranda waivers, Lukehart wrote concerning the initial period he spent in the yard of Trooper Davis: "I wandered into the yard of a state trooper ... and asked him to notify the police and let them know where I was. I even asked him to restrain me."
As to interrogation, the evidence supports the trial court's findings that the police considered Lukehart to be an eyewitness rather than a suspect before he waived his Miranda rights in the presence of Detective Goff and Lieutenant Waugh. Evidence also supports the trial court's finding that Lukehart made only voluntary statements during that time period.
Such voluntary statements to law enforcement officers do not "warrant a presumption of compulsion." Brown v. State, 565 So.2d 304, 306 (Fla.1990) (quoting Oregon v. Elstad, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). The Supreme Court held in Elstad that "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S. at 314, 105 S.Ct. 1285. Here, law enforcement officers did administer Miranda warnings subsequent to Lukehart's unwarned voluntary statements.
In Jennings v. State, 718 So.2d 144 (Fla.1998), we recently reiterated our often-made statement that a determination of the issues of both the voluntariness of a confession and a knowing and intelligent waiver of Miranda rights requires an examination of the totality of the circumstances. Id. at 150. See also Traylor v. State, 596 So.2d 957, 964 (Fla.1992). The trial court determined, based upon this substantial evidentiary record, that Lukehart voluntarily made his statements after *918 validly waiving his Miranda rights. This determination is supported by the record.
Law enforcement officers are not required to state the Miranda[6] procedural safeguard against compelled self-incrimination under the Fifth Amendment of the United States Constitution or article I, section 9 of the Florida Constitution unless a person is both in custody and being interrogated. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); Traylor, 596 So.2d at 966. In Sapp v. State, 690 So.2d 581, 585 (Fla. 1997), we recently stated:
We agree with the reasoning in [Alston v. Redman, 34 F.3d 1237 (3rd Cir. 1994)] and find it entirely consistent with the underlying premise of Miranda. Miranda's safeguards were intended to protect the Fifth Amendment right against self-incrimination by countering the compulsion that inheres in custodial interrogation. "[T]he presence of both a custodial setting and official interrogation is required to trigger the Miranda right to counsel prophylactic.... [A]bsent one or the other, Miranda is not implicated." Alston, 34 F.3d at 1243 (citing Miranda, 384 U.S. at 477-78, 86 S.Ct. 1602).
Sapp, 690 So.2d at 585.
Under the facts before the trial court in this case, the court could reasonably have concluded that through the time of the arrival of Detective Goff no interrogation of Lukehart had been undertaken. Moreover, we agree with the trial court that there is competent, substantial evidence to conclude that through that point in time Lukehart was not "in custody" as to the abduction of the baby.
At the end of the suppression hearing, Lukehart's argument was based upon his complaint that Lieutenant Redmond had not advised him of his rights after Lukehart told Lieutenant Redmond that he would tell him the truth. In rejecting this claim, the trial court stated:
Goff gives his constitutional rights, which the defendant freely admits he received and then ultimatelyReddish, I should say, gives him some constitutional rights when he comes on the scene, he transports him down to the Police Memorial Building, gives him some more constitutional rights. In the meantime, they are now signing rights.
So how many does he have to give before they stick? That's my point, I mean, if he had never been given any rights, anything that he said after he said I want a lawyer up to the time that he was given his constitutional rights, anything that was obtained byfrom the defendant was something that he voluntarily gave, not that it was solicited by way of a question by any officers.
... [W]hen does the constitutional rightswhen do we have to quit giving it to him? He said on each occasion he signed at least one form that he understood it all, so where is the point there that we don't have to continue giving him rights?
We believe the trial court's conclusion is supported by the evidence, and that under the totality of the circumstances, Lukehart's statements were obtained in a manner compatible with the requirements of the United States and Florida Constitutions. Stano v. Butterworth, 51 F.3d 942, 944 (11th Cir.1995).
In the second subissue within this claim, Lukehart argues that the trial court erred in admitting his statements into evidence because, although he had invoked his right to counsel very early on the evening of February 25 by saying to Officer Davis that he wanted to talk to a *919 lawyer, police had interrogated him without providing him with a lawyer. Lukehart contends that the interrogation violated principles set forth in Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and Traylor, 596 So.2d at 966, which hold that once a person in custody has requested a lawyer, all interrogation must stop until that person has a lawyer present. However, as set forth in detail in the law enforcement officers' testimony in the suppression hearing, the officers did not begin interrogating Lukehart until after Lukehart initiated the conversations by repeatedly stating that he wanted to talk to detectives to "tell his side of the story." Even then, the questioning began only after Lukehart had waived his Miranda rights.
As to the claim in this Court regarding Lukehart's request for a lawyer, we rejected a similar argument recently in Jennings, 718 So.2d at 150. As noted previously, Lukehart initiated the contact with Detective Goff by requesting the opportunity to "tell his side of the story." Detective Goff responded appropriately by telling Lukehart that he understood that Lukehart had requested a lawyer previously and that he would talk with him only after he read Lukehart his Miranda, rights. In this situation, we find our statement in Jennings to be controlling:
In short, the totality of the circumstances establishes that even if Jennings invoked his right to counsel, see State v. Owen, 696 So.2d 715 (Fla.[1997]), he voluntarily initiated further contact with the police. He gave the statements he now seeks to suppress after voluntarily, knowingly, and intelligently waiving the Miranda rights.
Jennings, 718 So.2d at 150 (citation omitted).
Likewise, in Traylor, we earlier held:
Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.

Traylor, 596 So.2d at 966 (footnote omitted; emphasis added). After talking with Detective Goff, Lukehart volunteered statements to detectives and waived the right to counsel three more times. Thus, the trial court did not err in denying the motion to suppress on Miranda right-to-counsel grounds.
As his third subissue within this claim, Lukehart argues that law enforcement officers coerced him to make his statements by using three illegal tactics. First, Lukehart contends that his statements were erroneously admitted because they had been obtained after police read him his Miranda rights so many times that the very reading of the rights became a coercive action. Lukehart cites Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), in which the Supreme Court held that when a suspect in custody requests counsel, interrogation must cease until counsel is present and may not be reinitiated without counsel present, even if the accused has consulted with his or her attorney. Id. at 153, 111 S.Ct. 486. The Court explained that the purpose of its holding was to protect suspects from "persistent attempts by officials to persuade him to waive his rights." Id. Here, the law enforcement officers testified at the suppression hearing that they read Lukehart his Miranda rights four times: twice at the Clay County scene, once at the Police Memorial Building, and once at the Duval County scene where Gabrielle's body was found. Under the totality of these circumstances, we find that this repeated reading of constitutional rights was an effort to provide the procedural safeguards at every step of the investigation and not an attempt to persist in attempts to persuade Lukehart to talk to the law enforcement officers.
Lukehart's own testimony does not support this argument on appeal. In contrast *920 to the appellant in Minnick, Lukehart had voluntarily given police information about the disappearance of the victim and repeatedly said to Officer Davis that he wanted to tell his side of the story. We find that no coercion occurred in the administration of the Miranda warnings.
Lukehart next alleges that Lieutenant Redmond used the so-called "Christian burial technique" of interrogation, which this Court found in Roman v. State, 475 So.2d 1228 (Fla.1985), to be "unquestionably a blatantly coercive and deceptive ploy." Id. at 1232. Lieutenant Redmond testified at the suppression hearing that he merely told Lukehart that law enforcement officers needed to find the baby's body so that she could have a "decent" burial. However, as in Roman and Hudson v. State, 538 So.2d 829, 830 (Fla.1989), we consider the totality of the circumstances and find that the reference to finding the body so that it could be buried was insufficient to make an otherwise voluntary statement inadmissible. In this case, the evidence was in conflict as to whether the word "Christian" was used. There was no evidence that Lieutenant Redmond knew anything about Lukehart's religious beliefs. Moreover, we find that the use of this tactic, no matter how the officer worded the burial comment, did not directly result in Lukehart's giving his statement, and, thus, the trial court did not err in declining to suppress the statements that Lukehart made subsequent to Lieutenant Redmond's burial comment.
Finally, Lukehart argues that Lieutenant Redmond's showing him a photograph of the baby was coercive in that it prompted Lukehart to become emotional and then to confess. Lieutenant Redmond testified that, as he sat in a patrol car with Lukehart, someone handed him a photograph to help to identify the baby and Lukehart saw it. In the suppression hearing, Lukehart testified that he did not find the viewing of such a photograph for identification purposes to be unusual. Moreover, as with the burial comment, we find that the photograph did not directly result in Lukehart's statement, which he had already agreed to give. Thus, we find that this subissue of the suppression claim has no merit. Accordingly, we uphold the trial court's ruling on the motion to suppress Lukehart's statements.

Other Guilt Phase Claims
In his second claim, Lukehart contends that the trial court erred by limiting cross-examination of Deputy Gardner as to whether police had provided a lawyer for Lukehart after his request for counsel. Lukehart argues that the refusal of the trial court to allow the cross-examination, which was intended to cast doubt upon the voluntariness of Lukehart's statements to police, violated his rights of confrontation, due process, and fair trial under the United States and Florida Constitutions. The relevant exchange during cross-examination of Deputy Gardner was as follows:
Q He also told you he wanted a lawyer, didn't he?
A Yes, he did.
Q Was one provided him by you?
[Prosecutor]: Objection, that's not relevant to the trial. That's already been determined by this Court.
THE COURT: Sustained.
While trial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about interrogation that is repetitive or only marginally relevant, Moore v. State, 701 So.2d 545, 549 (Fla.1997), we believe that, in this case, the trial court erred in restricting the cross-examination because Lukehart should have been allowed to inform the jury of his lack of counsel at that point. However, this error was harmless beyond a reasonable doubt in view of the totality of the evidence, which demonstrated that the statements were voluntarily made and that Lukehart was without counsel at the time he was talking to Detective Goff, Detective Reddish, and Lieutenant Redmond.
*921 In his third claim, Lukehart contends that the trial court erred in denying his motion for judgment of acquittal after the trial because (1) the evidence did not prove premeditated murder, and (2) Lukehart's dual convictions violate double jeopardy principles and thus the felony murder conviction cannot stand because it is based on the underlying felony conviction for aggravated child abuse.
As to premeditation, the first subissue within this claim, Lukehart argues that no eyewitnesses saw the murder and that evidence of physical injuries to the baby is insufficient, in view of the other evidence, to sustain the charge that the murder was premeditated. In support of his argument, he cites Kirkland v. State, 684 So.2d 732 (Fla.1996), in which this Court held that the State did not prove premeditation based on evidence of a severe neck wound caused by many slashes with a knife. Id. at 735. The State counters that Lukehart's testimony that he knew the baby was hurt because she cried after the first blow is evidence of premeditation, citing Sired v. State, 399 So.2d 964 (Fla.1981), for the proposition that premeditation "may occur a moment before the act." Id. at 967.
A premeditated design to take the life of the person killed is an essential element of premeditated murder. Forehand v. State, 126 Fla. 464, 171 So. 241, 242 (1936). This Court has recently defined premeditation:
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
"Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted."
Green v. State, 715 So.2d 940, 943-44 (Fla. 1998) (citations omitted) (quoting Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986), and Holton v. State, 573 So.2d 284, 289 (Fla. 1990)).
Here, Rhue, her father, and her uncle all testified that Lukehart had been an affectionate father figure to the baby. Although Lukehart gave various accounts of what occurred with the baby and stated that he killed the baby, there was a lack of evidence from which it could reasonably be concluded that Lukehart ever intended the baby's death. Thus, we find that the State did not prove premeditated first-degree murder.
However, although we have found that the evidence in this case does not support premeditation, reversal is not warranted because there was an alternate theory of guilt, first-degree felony murder, for which evidence was sufficient. See San Martin v. State, 717 So.2d 462 (Fla.1998), cert. denied, 526 U.S. 1071, 119 S.Ct. 1468, 143 L.Ed.2d 553 (1999). Here, the record indicates that the trial court instructed the jury that it could return a guilty verdict for first-degree murder if it found that the prosecution had proven either premeditated murder or first-degree felony murder.[7] For a first-degree felony murder conviction, the jury was instructed, pursuant to the Florida Standard Jury Instructions in Criminal Cases, that it was "not necessary *922 for the State to prove that the defendant had a premeditated design or intent to kill." Rather, the court told the jury that the State had to prove beyond a reasonable doubt the following felony murder elements:
One, Gabrielle Hanshaw is dead, two, that death occurred as a consequence of and while Andrew Richard Lukehart was engaged in the commission of aggravated child abuse, three, Andrew Richard Lukehart was the person who actually killed Gabrielle Hanshaw.
As to "the commission of aggravated child abuse," the jury was instructed, pursuant to the standard jury instructions, that it had to find Lukehart guilty of battery by finding that Lukehart had "intentionally or knowingly" caused great bodily harm to the child and that the child was under eighteen years of age. In addition to returning a general verdict of first-degree murder, based on either premeditated or felony murder, the jury convicted Lukehart on a separate charge of aggravated child abuse under section 827.03(2)(a), Florida Statutes (1995).[8] The Duval County grand jury indictment charged that the aggravated child abuse was "by inflicting blunt trauma to the head of the [baby]." The jury was instructed that, in order to return a guilty verdict, it had to find that the State proved beyond a reasonable doubt that Lukehart committed an aggravated battery.[9]
Our review of the record supports the jury's finding that Lukehart is guilty of aggravated child abuse. According to Lukehart's own testimony, Lukehart was six-feet one-inch tall and weighed 225 pounds at the time of the baby's death. He forcibly pushed the baby down on the floor. The jury could have reasonably concluded that Lukehart was frustrated by the baby's need for a clean diaper and by the baby's movement as he tried to change her diaper. The jury's verdict is also supported by the medical examiner's testimony that the baby died of injuries caused by blunt trauma from five blows to her head, two of which caused fractures, that the baby had bruises on her hand and arm that occurred shortly before her death, and that these injuries could have resulted only from the use of substantial force. The medical examiner explained that "if you use your fist it will be that force [equal to the force of dropping a child from a height greater than four to five feet] that you need to fracture the skull." Thus, because of the felony murder conviction, we find no error in the trial court's denial of Lukehart's motion for judgment of acquittal.
As to the second subissue within this claim, we find Lukehart's argument that double jeopardy principles prohibit the dual convictions of felony murder and aggravated child abuse to be without merit. Section 775.021(4), Florida Statutes (1995), which provides the test for determining double jeopardy violations, does not prohibit a defendant from being separately convicted and sentenced for felony murder and the qualifying felony.
This issue was recently addressed by the Third District Court of Appeal in Green v. State, 680 So.2d 1067 (Fla. 3d DCA 1996), in an opinion which we approve. Judge Cope wrote for the court:
Simply put, defendant can be convicted of both felony murder and the qualifying felony because the felony murder statute says so. The Florida Supreme Court recently so held in Boler v. State, 678 So.2d 319, 322 (Fla.1996)....
*923 680 So.2d at 1068. We further agree with Judge Cope's analysis set forth in Footnote 2 of that opinion:
Finally, in aggravated child abuse cases there is ordinarily overt physical violence which is directed towards a child. By specifically including the category of aggravated child abuse within the felony murder statute, the legislature clearly contemplated that both charges can be made where violence directed at the child results in the death of the child.
680 So.2d at 1069 n. 2.
Our affirmance of the convictions for both felony murder and aggravated child abuse is in accord with this Court's decision in Boler. However, Lukehart argues that our decision in Mills v. State, 476 So.2d 172 (Fla.1985), should control. In that decision, we held that we did not believe it proper to convict a defendant for aggravated battery and simultaneously for homicide as a result of one shotgun blast. Id. at 177. We stated that we did not believe that the Legislature intended convictions on both charges. Id. Subsequent to Mills, the Legislature amended section 775.021(4), Florida Statutes,[10] and in State v. Smith, 547 So.2d 613 (Fla.1989), this Court recognized the effect of the amendment by stating: "Multiple punishment shall be imposed for separate offenses even if only one act is involved." Id. at 616. The statutory amendment also led this Court to our conclusion in Boler, which controls in this case. Boler, 678 So.2d at 322. See also Cardona v. State, 641 So.2d 361, 364 n. 2 (Fla.1994); Valdes v. State, 626 So.2d 1316, 1322 n. 8 (Fla. 1993); Dingle v. State, 699 So.2d 834, 835 (Fla. 3d DCA 1997). Therefore, we find no merit in this claim.
In his fourth claim, Lukehart contends that the trial court erred in refusing to allow him to waive the jury instructions on the defense of justifiable and excusable homicide. Lukehart provides no relevant support in statute or caselaw for this argument, and we find no merit in the claim.
Accordingly, we affirm Lukehart's convictions.

PENALTY PHASE
Lukehart raises a total of eight claims concerning his death sentence. We turn first to claims six through nine, in which Lukehart challenges the trial court's instructions upon and finding of certain aggravating circumstances. Following our analysis of these arguments, we will discuss Lukehart's fifth claim, in which he argues that his death sentence is not a proportional punishment, and his remaining three claims.
In his sixth claim, Lukehart argues that the aggravator that the murder was committed in the course of a felony cannot be based on a felony that constituted the homicidal act because there was no felony separate from the instant homicide. Lukehart contends that the rationale of Mills v. State, 476 So.2d 172, 177 (Fla. 1985), should be applied to this claim because aggravated child abuse is an enumerated felony in section 921.141, Florida Statutes (1995). We do not agree. Mills is not applicable to this issue. In Mills we resolved a different issue, which was whether a conviction of first-degree murder and aggravated battery could both stand when arising out of the same act. In Mills, we vacated the conviction of aggravated battery. See State v. Enmund, 476 So.2d 165 (Fla.1985), approved, Boler v. State, 678 So.2d 319, 321 (Fla.1996). Mills does not involve the same issue we have here. In Blanco v. State, 706 So.2d 7 (Fla.1997), we specifically rejected the instant claim as to the murder in the course of a felony aggravator. Thus, we find no merit in this claim.
*924 In his seventh claim, Lukehart contends that the trial court erred in instructing the jury that it could weigh as an aggravating circumstance the fact that Lukehart was on felony probation at the time of the instant crime and then the court erred in finding this aggravator in the sentencing order. He asserts that the finding of this aggravator violates the ex post facto provisions of the United States and Florida Constitutions.[11] The instant murder was committed on February 25, 1996, and Lukehart's sentencing proceeding began on March 13, 1997. At the time of this crime, the first aggravator listed in Florida's death penalty statute provided in relevant part:
(5) Aggravating circumstances Aggravating circumstances shall be limited to the following:
(a) The capital felony was committed by a person under sentence of imprisonment or placed on community control.
§ 921.141(5)(a), Fla. Stat. (1995). At the time of the murder, the aggravator provided in subsection (5)(a) did not apply to persons on probation. See Ferguson v. State, 417 So.2d 631, 636 (Fla.1982); Bolender v. State, 422 So.2d 833, 837 (Fla. 1982); Peek v. State, 395 So.2d 492, 499 (Fla.1980). Thereafter, the Legislature amended section 921.141(5)(a) to add "or on probation," ch. 96-290, § 5 Laws of Fla., and further revised subsection (5)(a) to specify "felony probation" and previous felony conviction. Ch. 96-302, § 1, Laws of Fla. Pursuant to these amendments, probationary status did not become a statutory aggravator until May 30, 1996.
Over defense objection the trial court instructed the jury that in deliberating its sentencing recommendation it could consider as an aggravator the fact that Lukehart was on felony probation. In his sentencing order, the judge found felony probation as one of three aggravating circumstances.
Lukehart contends in this appeal that the Legislature's amendment of section 921.141(5)(a) to add probation to the list of statutory aggravators was a substantive change in the law, not a mere refinement of the law as this Court found the "community control" aggravating circumstance to be in Trotter v. State, 690 So.2d 1234 (Fla. 1996). In Trotter, this Court held that the trial court's use of the fact that the murder was committed while the defendant was on community control did not violate the defendant's ex post facto rights, even though the crime and sentencing took place before the sentencing provision was amended to add the "community control" aggravator. Id. at 1237. Lukehart points to our reasoning in Trotter, in which we found that "[c]ustodial restraint has served in aggravation in Florida since the `sentence of imprisonment' circumstance was created, and enactment of community control [as an aggravator] simply extended traditional custody to include `custody in the community.'" 690 So.2d at 1237. Lukehart argues that this holding carries the implicit conclusion that community control was from its inception a form of custodial restraint within the meaning of the "under sentence of imprisonment" aggravator. As to probation, Lukehart argues that until May 30, 1996, the death penalty statute contained no mention of probation as an element of the "under sentence of imprisonment aggravator" at section 921.141(5) and, in fact, Florida case law specifically held that probation was not an aggravator. Ferguson; Bolender; Peek. Thus, Lukehart argues that the finding of probation as an aggravator in this case was an ex post facto violation in that it produced an increased risk of increasing the measure of punishment attached to the covered crimes. See Lynce v. Mathis, 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *925 Dugger v. Williams, 593 So.2d 180 (Fla. 1991).
We agree. We conclude that the Legislature, in amending section 921.141(5)(a) to include the phrase "or on probation," altered the substantive law by adding an entirely new aggravator to be considered in determining whether to impose a death sentence. See State v. Hootman, 709 So.2d 1357, 1360 (Fla.1998). Therefore, application of the aggravator in this case was a violation of Lukehart's ex post facto rights. Accordingly, we hold that the instruction upon and finding of probation as a statutory aggravator in this case was error on the part of the trial court. However, we find this error to be harmless beyond a reasonable doubt in light of the fact that the jury was aware that Lukehart was on probation for the child abuse conviction. Admission of evidence of that fact was relevant in the proof of the prior violent felony aggravator as a showing of the proximity in time of the prior felony infant abuse to the killing of the infant in this case. The error is likewise harmless as to the trial court's weighing of the aggravators and mitigators because the trial judge merged the probation aggravator with the prior violent felony aggravator in his sentencing order.
In his eighth claim, Lukehart argues that the trial court committed the error of improper doubling by finding separately the two aggravating circumstances that the murder was committed by a person engaged in aggravated child abuse and that the victim was under twelve years of age. We agree with this contention. Improper doubling occurs when aggravating factors refer to the same aspect of the crime. See Provence v. State, 337 So.2d 783, 786 (Fla.1976). Here, both of the challenged aggravators were based upon the victim's status as a child, and we find that allowing the two to operate as separate aggravators does constitute the sentencing error of improper doubling. However, we find this error to be harmless beyond a reasonable doubt. While the treating of these aggravators as two aggravators is error, the fact that the victim was under twelve years of age is properly considered in weighing the aggravating factor that the murder occurred while Lukehart was engaged in the commission of aggravated child abuse. The fact that the victim was a helpless infant increases the weight of that aggravator.
In his ninth claim, Lukehart argues that the "victim under 12 years of age" aggravator is unconstitutional in that it is over-inclusive and is a strict liability determinant of life or death. We find this argument to be procedurally barred in that Lukehart did not object at trial on constitutional grounds to the jury instruction on this aggravator. Even if this claim were not procedurally barred, we would reject it in view of our determination in this case that the victim's age was not properly found as a separate aggravator.
As to Lukehart's fifth claim, that his death sentence is not proportional, we find no merit in this claim. The court found three aggravators: that the murder occurred during commission of the felony of aggravated child abuse; that the victim was under twelve years of age; and that Lukehart had been convicted of a prior violent felony, which the court combined with the aggravator of Lukehart's felony probation status at the time of the murder. Because of the court's merging of the felony probation aggravator with the prior violent felony aggravator, our finding of error as to the probation aggravator has no effect upon the proportionality analysis. Likewise, our finding of improper doubling of aggravators is irrelevant to assessing proportionality because the fact that the victim was under twelve years of age is included in the weighing of the felony murder aggravator, which stems from Lukehart's conviction of aggravated child abuse. Thus, we analyze the proportionality of Lukehart's sentence based upon a finding of the two valid aggravating circumstances of prior violent felony and felony murder *926 based upon aggravated child abuse, each of which bears heavy weight in our analysis.
In arguing his proportionality claim, Lukehart contends that most child murder cases in which trial courts have imposed and we have affirmed death sentences are based upon factual situations including either sexual battery or findings of the aggravating factor of heinous, atrocious, or cruel (HAC), neither of which was present in this case. See, e.g., Davis v. State, 703 So.2d 1055 (Fla.1997); Banks v. State, 700 So.2d 363 (Fla.1997). However, we find that the absence of the trial court's finding of sexual assault or HAC is not determinative in this case.
This case is significantly aggravated by the existence of the prior conviction for felony child abuse. Lukehart had previously pled guilty to felony child abuse for shaking his former girlfriend's eight-month-old daughter, Jillian French, so hard that the infant sustained a closed head injury resulting in seizures and visual deficits. This occurred on April 14, 1994. The murder for which Lukehart was convicted was committed less than two years after the felony abuse of that infant. In fact, Lukehart was still on probation for that prior felony conviction for abusing eight-month-old Jillian when Lukehart killed another girlfriend's infant daughter, the five-month-old infant victim in this case, on February 25, 1996. Thus, Lukehart's prior felony aggravator is an exceptionally weighty aggravating factor under the circumstances of the present case. See Sliney v. State, 699 So.2d 662, 672 (Fla. 1997); Ferrell v. State, 680 So.2d 390, 391 (Fla.1996). In addition, the trial court found and weighed the felony murder aggravator, which was that the murder occurred while Lukehart was engaged in the commission of aggravated child abuse.
Lukehart also urges us to find his case similar to Smalley v. State, 546 So.2d 720 (Fla.1989), in which we commuted a death sentence to life in prison in a case involving the murder of a twenty-nine-month-old child by a caregiver who was the live-in boyfriend of the child's mother. Id. at 723. However, Smalley is distinguished in that the trial court in Smalley found just one aggravating circumstance, HAC, along with four statutory mitigating circumstances and three factors in nonstatutory mitigation. Id. at 721. In Smalley, unlike the instant case, the appellant first tried cardiopulmonary resuscitation on the child he had injured and then rushed her to a medical facility. Id. Here, Lukehart concedes that, rather than seeking medical attention for the infant he had injured, Lukehart drove her to a secluded pond and left her to die.
As to mitigation in sentencing Lukehart, the trial court found and gave "some weight" to the two statutory mitigators of Lukehart's age (twenty-two) and his substantially impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, and "some weight" to each of the following four nonstatutory mitigators: Lukehart's alcoholic and abusive father; his drug and alcohol abuse; his being sexually abused as a child; and his being employed. This mitigation is not as extensive as the mitigation the court found and weighed in Smalley.
In Porter v. State, 564 So.2d 1060 (Fla. 1990), we found a death sentence to be proportional and stated that "[b]ecause death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." Id. at 1064 (citation omitted). After considering the totality of the circumstances and the mitigation in this case, we find Lukehart's death sentence to be proportionate. This murder of a defenseless infant falls within the category of the most aggravated and least mitigated of capital crimes. Accordingly, we find no lack of proportionality with other cases *927 wherein we have affirmed a sentence of death.
In his tenth claim, Lukehart argues that the trial court erred in allowing a collateral crime to become a feature of the penalty phase. This claim is procedurally barred because, as Lukehart admits, he did not object contemporaneously that the State's evidence concerning the collateral child abuse conviction became a feature of the penalty phase. We have considered the record, and we reject Lukehart's claim that this evidence became an undue focus of the sentencing proceeding. During the penalty phase, the prosecution presented three witnesses to establish the prior violent felony conviction and one witness to establish the "under sentence of imprisonment/felony probation" aggravator. These witnesses testified in a straightforward manner as to the injuries inflicted on Jillian French, the eight-month-old infant, and the related charge of felony child abuse against Lukehart and his subsequent plea bargain and four-year probation. None of these witnesses were relatives of the infant, and three of the four were cross-examined. In Lockhart v. State, 655 So.2d 69, 72 (Fla.1995), this Court held that details of prior violent felony convictions involving the use or threat of violence to the victim are admissible in the penalty phase of a capital trial to help determine whether to impose a death sentence. Id. at 72. Thus, we find that this claim, if it had been preserved for appellate review, would have no merit.
Likewise, Lukehart's eleventh claim, in which he contends that the prosecutor's closing argument was inflammatory and unsupported, is procedurally barred because it was not preserved by contemporaneous objection and motion for mistrial. Even if the claim were not barred, our review of the record reveals no reversible error in the closing argument in which the prosecutor asked the jury to hold Lukehart responsible for his actions despite his deprived background. We have permitted wide latitude in arguing to a jury. See Breedlove v. State, 413 So.2d 1, 8 (Fla. 1982). The prosecution may properly argue that the defense has failed to establish a mitigating factor and may also argue that the jury should not be swayed by sympathy. See Valle v. State, 581 So.2d 40, 47 (Fla.1991). Thus, even if this claim were preserved, we would find it to be without merit.
We also address Lukehart's twelfth claim, in which he argues that the trial court erred regarding a restitution order and its sentencing order for Lukehart's noncapital conviction of aggravated child abuse. In light of Lukehart's failure to raise a contemporaneous objection, we find to be procedurally barred his claim that the trial court erred in its imposition of restitution. See Cole v. State, 701 So.2d 845, 855 (Fla.1997). Within this issue Lukehart also claims that the trial court erred in failing to fill out a sentencing guidelines scoresheet in imposing Lukehart's concurrent fifteen-year prison sentence on the aggravated child abuse conviction. We agree with Lukehart that the trial court was required to complete a guidelines scoresheet for the noncapital offense. Thus, we remand for a resentencing on the aggravated child abuse conviction and direct the court to properly complete the guidelines scoresheet.

CONCLUSION
Accordingly, we affirm Lukehart's convictions and his death sentence for first-degree murder. We remand for a resentencing on Lukehart's aggravated child abuse conviction.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, PARIENTE and LEWIS, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part as to sentence with an opinion.
QUINCE, J., recused.
*928 ANSTEAD, J., concurring in part and dissenting in part.
I cannot agree that the approval of the death sentence here is consistent with our controlling case law. As noted by the majority opinion, our proportionality review requires a consideration of "the totality of the circumstances in a case" along with a comparison of "other capital cases" in order to determine if this case is among the most aggravated and least mitigated murder cases that merit the death penalty. See majority op. at 926 (citing Porter v. State, 564 So.2d 1060 (Fla.1990)). A review of the majority opinion reflects that it has erroneously focused only on the first prong of this analysis. Further, it appears that based solely upon the fact that the victim in this case was a five-month-old child, the majority has established a rule that death is automatically the appropriate penalty without regard to the balance of aggravation and mitigation that is required. In fact, the majority is unable to cite a single similar case we have decided in support of the death sentence imposed here.
The most telling distinction between this case and all the prior cases in which we have approved the death penalty for a child's death is the serious aggravation that is not present here. Even the majority acknowledges that Lukehart did not intend to kill the child:
Here, Rhue, her father, and her uncle all testified that Lukehart had been an affectionate father figure to the baby. Although Lukehart gave various accounts of what occurred with the baby and stated that he killed the baby, there was a lack of evidence from which it could reasonably be concluded that Lukehart ever intended the baby's death. Thus, we find that the State did not prove premeditated first-degree murder.
The vast majority of cases involving the death of a child where the death penalty has been approved by this Court consistently involve acts of sexual abuse or sexual battery, and in all such cases, the HAC aggravator was established and found by the trial court. See, e.g., Davis v. State, 703 So.2d 1055 (Fla.1997) (finding death sentence proportional for the murder of a two-year-old girl where the trial judge found that the murder was HAC and was committed during the course of a sexual battery); Sanchez-Velasco v. State, 570 So.2d 908 (Fla.1990) (upholding death sentence for murder and sexual battery of eleven-year-old girl where murder was HAC and was committed while the defendant was engaged in the commission of a sexual battery and no mitigation was found). As noted, this case did not involve sexual acts and the HAC aggravator was neither pursued nor found.
The absence of the HAC aggravator in this case is, of course, critical. Just recently, this Court reaffirmed that HAC, along with CCP, "are two of the most serious aggravators set out in the statutory sentencing scheme, and while their absence is not controlling, it is also not without some relevance to a proportionality analysis." Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
The valid aggravation in this case consists of the fact that the murder was committed in the course of committing aggravated child abuse and the previous felony conviction. This aggravation must be weighed and balanced against the established mitigation. In this case, the trial court found and gave some weight to six mitigating factors These six factors include two statutory mitigators and four nonstatutory. The statutory mitigators were: (1) defendant's age (twenty-two) supported by the expert's testimony that the defendant's maturity level was less than his actual age; and (2) impairment of his capacity to appreciate the criminality of his conduct. As nonstatutory mitigation, the trial judge found: (1) Lukehart's father was an alcoholic who physically abused him; (2) Lukehart suffered from drug and alcohol abuse; (3) Lukehart was repeatedly sexually abused by his uncle; and (4) Lukehart was *929 gainfully employed at the time of the crime. The trial court gave some weight to all of this mitigation. In addition and in support of some of these factors, the expert testified that Lukehart suffers from an intermittent explosive disorder and from post-traumatic stress disorder, and that he has a personality disorder that can be described as being antisocial with destructive behavior.
A comparison with our prior cases makes it apparent that death is not the appropriate penalty here. See, e.g., Jones v. State, 705 So.2d 1364 (Fla.1998); Smalley v. State, 546 So.2d 720 (Fla.1989). Smalley cannot be distinguished in any meaningful way from this case except that the circumstances of Smalley appear to be even more egregious. In Smalley, the defendant was the live-in boyfriend of the twenty-eight-month-old victim's mother. While defendant was babysitting the small child, the child began to cry and whine. As a result, the defendant repeatedly struck the child throughout the day. He also dunked the child's head into water, and after she continued to cry, he banged her head in the carpeted floor several times. His attempt to resuscitate her failed. Based on his actions, Smalley was convicted of first-degree murder and sentenced to death. In support of the death penalty, the trial court found that the murder was HAC, but also found seven mitigating circumstances. On appeal, we upheld the HAC finding, but reversed the death sentence, ruling that the balance of the HAC aggravator and the established mitigation did not warrant imposition of the death penalty. The facts of the current murder were almost identical to those of Smalley. Similarly, in Jones, this Court vacated the defendant's death sentence for the murder of a schoolboy where two aggravators (murder committed during the course of a robbery and for pecuniary gain) were merged and considered only as one and some nonstatutory mitigation was established. See id. at 1365.
The facts of this present case are also strikingly similar to several other child victim cases where death was never imposed. See Dingle v. State, 699 So.2d 834 (Fla. 3d DCA 1997); Green v. State, 680 So.2d 1067 (Fla. 3d DCA 1996); Freeze v. State, 553 So.2d 750 (Fla. 2d DCA 1989). In Freeze, for example, the eight-month-old child victim's mother was convicted of aggravated child abuse and first-degree felony murder and sentenced to life imprisonment with a minimum mandatory sentence of twenty-five years on the felony murder charge and a concurrent sentence of fifteen years on the aggravated child abuse. The abusive conduct in the case consisted of the mother's violent shaking and severe beating of the child. As in our case, there was evidence that the mother had severely shaken and abused her child before, yet a death sentence was not imposed. See id. at 754.
Finally, this case is also similar to several cases dealing with child victim murders where we vacated the trial judge's death sentence imposed after the jury had recommended a life sentence. See, e.g., Reilly v. State, 601 So.2d 222 (Fla.1992); Morris v. State, 557 So.2d 27 (Fla.1990); Wasko v. State, 505 So.2d 1314 (Fla.1987). In Reilly, the defendant was convicted of felony murder, sexual battery, and aggravated child abuse for the killing of a five-year-old boy who had gone fishing near a neighbor's dock. The autopsy revealed trauma and wounds to his head and neck, and his throat had multiple lacerations. The cause of death was determined to be asphyxiation due to strangulation. The jury recommended a life sentence by a vote of eight to four. However, the trial judge overrode the jury's recommendation and sentenced the defendant to death for the murder. In support of the sentence, the trial judge issued a thirty-page sentencing order where he found three aggravating factors and no mitigation. The three aggravators were: (1) previous conviction for a violent felony; (2) the homicide occurred during the commission of a sexual battery and an aggravated child *930 abuse; and (3) the homicide was committed in a heinous, atrocious, or cruel manner. Notwithstanding, on appeal, this Court reversed the trial court's imposition of the death sentence and held that the totality of the evidence presented at trial provided a reasonable basis for the jury's life sentence. Similarly, in Wasko, we overturned the death penalty imposed by the trial court for the murder of a ten-year-old girl after the jury had recommended life even though three valid aggravators and only one factor in mitigation were found. Although these cases differ from Lukehart's in that the jury in both of these cases recommended a life sentence, the murders there were clearly more aggravated and less mitigated than the murder here.
The bottom line is that our approval of the death sentence here is dramatically inconsistent with our case law involving other child murders.
NOTES
[1] Lukehart claims that: (1) the trial court erred in refusing to suppress Lukehart's statements; (2) the trial court erred by limiting cross-examination; (3) Lukehart's convictions of first-degree murder and aggravated battery are invalid because of insufficient evidence of premeditation and the lack of a felony independent of the homicide; (4) the trial court erred in instructing the jury on justifiable or excusable homicide; (5) Lukehart's death sentence is disproportionate; (6) the trial court erred in finding that the murder in the course of a felony aggravator had been established; (7) the trial court erred in applying the new aggravator of a crime committed while on felony probation; (8) the trial court erred in finding both murder in the course of a felony and that the victim was under twelve as aggravators (improper doubling); (9) the victim-under-twelve aggravator and the standard jury instruction on the aggravator are unconstitutional; (10) the trial court erred in allowing a collateral crime (found to be a prior violent felony) to be a feature of the penalty phase; (11) the prosecutor's closing argument comments during the penalty phase were fundamental error; and (12) the trial court erred regarding the sentence for the noncapital conviction and the restitution orders.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Misty Rhue testified that Lukehart drove away from her house in her car, a white 1981 Oldsmobile. This factual discrepancy is immaterial for purposes of this decision.
[4] The Baker Act, also known as the Florida Mental Health Act, provides in part that "a law enforcement officer shall take a person who appears to meet the criteria for involuntary examination into custody." § 394.463(2)(a)2., Fla. Stat. (1995).
[5] The rights card, which was admitted into evidence, provides as follows:

YOUR CONSTITUTIONAL RIGHTS
You have the following rights under the United States Constitution.
You do not have to make a statement or say anything.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before you make a statement or before any questions are asked of you, and to have the lawyer with you during any questioning.
If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish.
If you do answer questions, you have the right to stop answering questions at any time and consult with a lawyer.
[6] Under Miranda, a person "taken into custody or otherwise deprived of his freedom by the authorities in any significant way ... must be warned prior to any questioning that he has the right to remain silent, that anything he says may be used against him in a court of law" and that he has the right to the presence of a lawyer. 384 U.S. at 478-79, 86 S.Ct. 1602 (emphasis added).
[7] Section 782.04, Florida Statutes (1995), defines first-degree felony murder in relevant part:

(1)(a) The unlawful killing of a human being:
. . . .
2. When committed by a person engaged in the perpetration of, or in the attempt to perpetrate,....
. . . .
(h) Aggravated child abuse,
. . . .
[8] Section 827.03, Florida Statutes (1995), provides in relevant part: "(1) Aggravated child abuse is defined as one or more acts committed by a person who: (a) commits aggravated battery on a child."
[9] Section 784.045, Florida Statutes (1995), provides in relevant part:

(1)(a) A person commits aggravated battery who, in committing battery:
1. Intentionally or knowingly causes great bodily harm, permanent disability, or permanent disfigurement....
[10] The amendment provided in relevant part: "(b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction." Ch. 88-131, § 7 at 709, Laws. of Fla.
[11] Article I, section 9 of the United States Constitution provides in relevant part: "No bill of attainder or ex post facto Law shall be passed." Article I, section 10 of the Florida Constitution provides in relevant part: "No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed."